# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# ABILENE DIVISION

| | |
|---|---|
| **BRENDEN STANISLAUS,** § <br> Plaintiff, § <br> § <br> v. § <br> § <br> **TOKAI CARBON CB,** § <br> **LTD.,** § <br> Defendant. § | **CIVIL ACTION NO.** <br> **1:23-cv-206** <br> **JURY** |

## PLAINTIFF BRENDEN STANISLAUS'S ORIGINAL COMPLAINT AND JURY DEMAND

TO THE HONORABLE DISTRICT COURT JUDGE:

Plaintiff Brenden Stanislaus sues Defendant Tokai Carbon CB, Ltd., for disability discrimination and retaliation in violation of the Texas Labor Code and the Americans with Disabilities Act, as amended, as well as for retaliation for requesting and taking protected leave under the Family and Medical Leave Act, and interference in his use of that leave. In support, he shows the following:

### I. PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Brenden Stanislaus is an individual who resides in Howard County, Texas.

2. Defendant, Tokai Carbon CB, Ltd., is a Texas company with its principal place of business in North Carolina. Defendant may be served through its registered agent for service of process in Texas, Capitol Corporate Services, Inc., 1501 S. Mopac Expy, Ste. 220, Austin, TX 78746.

3. Personal jurisdiction over Defendant is appropriate because at all times relevant to

Plaintiff's claims it operated in the state of Texas, and all of the events giving rise to this lawsuit occurred in Howard County in the state of Texas. Further, an exercise of jurisdiction will not offend traditional notions of fair play and substantial justice.

4. Defendant is an employer within the meaning of the Americans with Disabilities Act, as amended; the Texas Labor Code; and the Family and Medical Leave Act.

5. This Court has jurisdiction to hear the merits of the claims under 28 U.S.C. § 1331 for Plaintiff's claims under federal law, and under 28 U.S.C. § 1367 for his claims under Texas law.

6. Venue is proper in the district and division under 28 U.S.C. § 1391(b).

## II. FACTUAL BACKGROUND

7. Brenden Stanislaus first started working for the predecessor company of Tokai, Sid Richardson, in or about September 2012.

8. Mr. Stanislaus was first hired as a shipper.

9. By approximately 2018, Mr. Stanislaus had been promoted to a co-gen operator position, responsible for the "co-gen" (co-generation) side of the plant, *i.e.*, power generation.

10. In that position, the vast majority of Mr. Stanislaus's time is spent at a computer desk in a control room with two-to-three other people actively working on connected workstations.

11. By 2019, Tokai had acquired Sid Richardson and Mr. Stanislaus became a Tokai employee, maintaining his seniority.

12. Starting in or about February 2022, Mr. Stanislaus began to experience severe back pain.

13. This substantially impaired Mr. Stanislaus's ability to remain sitting or standing for long periods, to stand up straight, to sleep a full night, and later to control his bladder.

14. Mr. Stanislaus's doctor diagnosed him with collapsed and bulging discs and with bone spurs in his lower lumbar vertebrae.

15. Mr. Stanislaus's doctor also discovered that his spinal column was narrowing over time due to compression.

16. Shortly thereafter, Mr. Stanislaus requested and was granted FMLA leave by Tokai from February 18 to March 8, 2022, in order to go through rehab to hopefully correct these disabilities prior to any surgery.

17. Shortly after Mr. Stanislaus came back from the FMLA leave, he personally told Production Manager Mike Ybarra about his back issues and diagnoses.

18. Also, prior to and during 2022, Mr. Stanislaus had to take several other short stints of FMLA leave to care for his wife, who had been hospitalized several times.

19. Because Mr. Stanislaus did not make progress in the first stint of rehab, his back pain unfortunately continued to worsen and he had to take additional time off starting September 1, 2022.

20. Mr. Stanislaus and his doctor then realized that he was going to need to be out for longer to go through additional rehab.

21. Therefore, or about September 6 or 7, 2022, Mr. Stanislaus requested FMLA leave for his back a second time, to cover a period from September 1 through September 23, 2022.

22. Unlike the prior stint of FMLA leave, Mr. Stanislaus never received any sort of formal acceptance or rejection of that leave period from Tokai.

23. However, Mr. Stanislaus's doctor was concerned he would need additional time off beyond September 23.

24. Therefore, on or about September 16, 2022, Mr. Stanislaus's doctor provided the company paperwork estimating he would need to be out approximately from October through mid-December of that same year.

25. A few days later, on September 22, HR manager Sonja Berinti called and emailed with Mr. Stanislaus about his expected return to work the next day per his original request on or about September 7.

26. Mr. Stanislaus explained to Ms. Berinti that he was likely going to need to extend his FMLA leave based on what his doctor was telling him.

27. Ms. Berinti told Mr. Stanislaus that the plant was short-staffed and they needed help now.

28. Feeling pressured to be a "team player," Mr. Stanislaus told Ms. Berinti that he *could* come back now if the company would accept his current work restrictions (limits on bending, lifting, carrying, and similar physical activities).

29. Ms. Berinti told Mr. Stanislaus that the company could accommodate that and would send him an approval letter to that effect.

30. Mr. Stanislaus provided those medical restrictions in writing from his doctor prior to his return.

31. However, Mr. Stanislaus never received that letter confirming his accommodations, which Ms. Berinti had told him to expect.

32. Mr. Stanislaus returned to work on September 23, 2022.

33. After that, Mr. Ybarra told Mr. Stanislaus that he (Mr. Ybarra) would tell the shift supervisors about Mr. Stanislaus's medical restrictions.

34. On or about October 4, 2022, Mr. Stanislaus received a letter from Tokai asking for more information before it would approve his request for FMLA leave that was supposed to go

from October to December because that time off was "inconsistent with [his] actual absence date."

35. Mr. Stanislaus's doctor subsequently sent in more medical paperwork on his need for leave, but Tokai never actually rendered a determination either way on that requested period of FMLA leave.

36. Therefore, Mr. Stanislaus continued to work.

37. Because he did not take that additional time off for treatment his doctor had recommended, Mr. Stanislaus's disability went untreated.

38. On or about November 29, 2022, Shift Supervisor Jeremy Gomez looked up from his desk in the control room and told Mr. Stanislaus that "they" wanted him to "write a report for what happened on October 8."

39. It was highly unusual to be asked about any incident that took place well over a month ago.

40. Mr. Stanislaus told Mr. Gomez that he had no idea what happened that day or what Mr. Gomez was wanting him to write.

41. Mr. Gomez told Mr. Stanislaus he had no idea what this was about either.

42. Indeed, Mr. Gomez had been absent that day, October 8.

43. Mr. Gomez acknowledged that fact to Mr. Stanislaus during the conversation.

44. Because Mr. Gomez had been absent that day, per standard operating procedure someone stepped in to replace him and everyone else moved up in duties.

45. For instance, that day the relief co-gen operator (Jacob Patterson) had taken over Mr. Stanislaus's duties, and Mr. Stanislaus had assumed the duties of the "carbon black operator" (Jonathan Stiles), while Mr. Stiles had taken over for Mr. Gomez.

46. At this point, Mr. Stanislaus grew concerned the company was searching for some excuse to discipline or terminate him.

47. Mr. Stanislaus told Mr. Gomez that since he had no idea what this was about and therefore could not write anything, he was not going to write a statement.

48. At this same time, Mr. Stanislaus also asked the other people in the control room (Mr. Patterson and Mr. Stiles) if they knew what this was about.

49. Mr. Patterson and Mr. Stiles said they had no idea either.

50. During this conversation on or about November 29, Mr. Gomez did not give Mr. Stanislaus any deadline for when this report was due.

51. Nor did Mr. Gomez express concern or appear at all upset when Mr. Stanislaus said he was not going to write a statement.

52. Because Mr. Stanislaus had no idea what this even was about and had told Mr. Gomez as much, ultimately he did not submit anything.

53. Neither Mr. Gomez nor anyone else with the company followed up with Mr. Stanislaus again about needing to submit any report.

54. On December 5, 2022, although the plant was short-handed that week, Mr. Stanislaus had no choice but to take a PTO day due to unmanageable back pain.

55. Mr. Stanislaus then scheduled a doctor's appointment.

56. The next day, December 6, 2022, Mr. Stanislaus called Shift Supervisor Nick Rivera early that morning to tell Mr. Rivera that he was needing to take another day off that day.

57. Mr. Rivera directly asked Mr. Stanislaus "is this gonna be FMLA?"

58. Mr. Stanislaus told him yes, because it was a problem with his back again.

59. On the morning of December 7, 2022, Mr. Stanislaus again called Mr. Rivera to tell him he would be out.

60. On the morning of December 8, 2022, Mr. Stanislaus called Shift Supervisor Keaton Hughes to tell Mr. Hughes he would be out.

61. On the evening of December 8, 2022, Ms. Berinti, Plant Manager Eric Gang, and Lab Manager Clint Caudill called Mr. Stanislaus.

62. Mr. Gang read off a paper and told Mr. Stanislaus that he was being fired because he had supposedly diverted water from a boiler feedwater pump and then hid damage to it, and then had refused to cooperate with the investigation.

63. No one (least of all Mr. Gomez on November 29) had ever mentioned any supposed damage to a pump at any point prior to this, or that Mr. Stanislaus was supposedly involved.

64. Mr. Stanislaus did not damage any pump during that time, and in fact he worked normally without noticing any issues whatsoever with any pumps between October and December 2022.

65. Nor did he hide damage to a pump.

66. Indeed, the day Mr. Gomez had asked about, October 8, Mr. Stanislaus could not have damaged the pump even if he had wanted to, because he was not acting as the co-gen operator that day.

67. No pump was ever replaced during that October-December time period, either.

68. Also, Mr. Stanislaus works with multiple other people in one control room, so it would have almost impossible to conceal a pump failure—both because other people could see my screen and because such a failure would immediately affect other systems.

69. During the termination call, Mr. Stanislaus tried to ask questions about what had happened, but Ms. Berinti told him he had no reason to ask questions and the decision had been made already.

70. Mr. Stanislaus later applied for unemployment benefits, and truthfully told the TWC around January 23, 2023, that he could not have been the cause of any damage the day in question because he was not acting as the co-gen operator that day, October 8.

71. On January 30, 2023, through counsel, Tokai represented that the date Mr. Stanislaus had supposedly damaged the pump (which, again, is false) was October 11, 2022, not October 8.

72. Approximately five or six years ago, back when he himself had been a co-gen operator, Mr. Stanislaus's supervisor Mr. Rivera had completely destroyed a boiler feedwater pump by running it without water.

73. Obviously, Mr. Rivera was not fired because of that incident, and later became Shift Supervisor.

74. That incident was common knowledge throughout the plant.

75. Mr. Stanislaus dual-filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission and Texas Workforce Commission – Civil Rights Division on February 10, 2023, and received the right to sue from the EEOC on July 24, 2023. He now timely files suit.

76. All conditions precedent to filing suit have been satisfied for fulfilled.

### III. DISCRIMINATION IN VIOLATION OF THE ADAAA

77. Mr. Stanislaus re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

78. Plaintiff had disabilities within the meaning of the Americans with Disabilities Act of 1990, as amended ("ADAAA") at the time of the adverse actions against him.

79. Plaintiff was qualified for his position at all relevant times.

80. Defendant's actions, including Plaintiff's discharge, were undertaken because of his disabilities. These actions constitute violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111, *et seq.*, as amended.

81. The employment practices complained of above were intentional. Defendant acted at all relevant times with malice and/or reckless indifference to Plaintiff's federally-protected rights. Plaintiff therefore seeks punitive damages.

82. As a result of Defendant's unlawful discrimination, Plaintiff has suffered and expects to suffer pecuniary losses, including but not limited to lost wages and other benefits associated with his employment.

83. As a result of Defendant's discrimination, Plaintiff has suffered non-pecuniary losses including, but not limited to, emotional pain, suffering, inconvenience, personal humiliation, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

84. To redress the injuries sustained by Plaintiff on account of Defendant's discriminatory actions, he has retained the undersigned counsel to represent him in this action. He therefore seeks recovery of reasonable attorneys' fees, experts' fees, and costs.

85. Additionally, Plaintiff seeks any and all equitable relief necessary to return him to the position that he would have been in but for Defendant's unlawful discrimination.

### IV. RETALIATION IN VIOLATION OF THE ADAAA

86. Mr. Stanislaus re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

87. Plaintiff requested reasonable accommodations for his disabilities.

88. Defendant retaliated against Plaintiff by, among other things, firing him because he requested reasonable accommodations.

89. The employment practices complained of above were intentional. Defendant acted at all relevant times with malice and/or reckless indifference to Plaintiff's federally-protected rights. Plaintiff therefore seeks punitive damages.

90. Defendant's actions in retaliating against Plaintiff constitute violations of the ADAAA.

91. As a result of Defendant's unlawful retaliation, Plaintiff has suffered and expects to suffer pecuniary losses, including but not limited to lost wages and other benefits associated with his employment.

92. To redress the injuries sustained by Plaintiff on account of Defendant's retaliatory actions, he has retained the undersigned counsel to represent him in this action. He therefore seeks recovery of reasonable attorneys' fees, experts' fees, and costs.

93. Additionally, Plaintiff seeks any and all equitable relief necessary to return him to the position that he would have been in but for Defendant's unlawful retaliation.

### V. DISABILITY DISCRIMINATION IN VIOLATION OF THE TEXAS LABOR CODE

94. Mr. Stanislaus re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

95. Defendant is an employer under Chapter 21 of the Texas Labor Code.

96. Plaintiff has disabilities under Chapter 21 of the Texas Labor Code.

97. Plaintiff was qualified for his position at all relevant times.

98. Defendant discriminated against Plaintiff because of his disabilities by, among other adverse actions, firing him because of his disabilities in violation of Chapter 21 of the Texas Labor Code.

99. The employment practices complained of above were intentional. Defendant acted at all relevant times with malice and/or reckless indifference to Plaintiff's rights. Plaintiff therefore seeks punitive damages.

100. Defendant's actions have caused damages to Plaintiff within the jurisdiction of this Court.

## VI. RETALIATION IN VIOLATION OF THE TEXAS LABOR CODE

101. Mr. Stanislaus re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

102. Defendant is an employer under Chapter 21 of the Texas Labor Code.

103. Plaintiff has disabilities under Chapter 21 of the Texas Labor Code.

104. Plaintiff was qualified for his position at all relevant times.

105. Plaintiff requested reasonable accommodations for his disabilities.

106. Defendant retaliated against Plaintiff by, among other things, firing him because he requested reasonable accommodations, in violation of Chapter 21 of the Texas Labor Code.

107. The employment practices complained of above were intentional. Defendant acted at all relevant times with malice and/or reckless indifference to Plaintiff's federally-protected rights. Plaintiff therefore seeks punitive damages.

108. Defendant's actions have caused damages to Plaintiff within the jurisdiction of this Court.

## VII. RETALIATION IN VIOLATION OF THE FMLA

109. Mr. Stanislaus re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

110. Plaintiff requested and took protected leave under the Family and Medical Leave Act.

111. Defendant subjected Plaintiff to adverse employment actions because of his engagement in protected activities, including firing him.

112. Defendant's actions constitute unlawful retaliation on the basis of Plaintiff's protected activity of requesting FMLA leave, in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq*.

113. The employment practices complained of above were intentional and willful.

114. As a result of Defendant's unlawful retaliation, Plaintiff has suffered and expects to suffer pecuniary losses, including but not limited to lost wages and other benefits associated with his employment.

115. To redress the injuries sustained by Plaintiff on account of Defendant's retaliatory actions, he has retained the undersigned counsel to represent him in this action. He therefore seeks recovery of reasonable attorneys' fees, experts' fees, and costs.

116. Additionally, Plaintiff seeks any and all equitable relief necessary to return him to the position that he would have been in but for Defendant's unlawful retaliation.

## IIX. INTERFERENCE IN FMLA RIGHTS

117. Mr. Stanislaus re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

118. At all relevant times, Plaintiff was an eligible employee as defined by the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq*.

119. At all relevant times, Defendant was an employer subject to the FMLA.

120. Defendant's actions as described above constitute unlawful denial of and/or interference with Plaintiff's exercise of his rights under the FMLA, in violation of 29 U.S.C. § 2615.

121. As a result of the unlawful actions of Defendant as described above, Plaintiff has suffered, and will continue to suffer, actual damages.

122. To redress the injuries sustained by Plaintiff on account of Defendant's actions, he has retained the undersigned counsel to represent him in this action.

123. Plaintiff therefore seeks recovery of reasonable attorneys' fees, experts' fees, and costs.

124. Plaintiff seeks to recover these pecuniary losses, liquidated damages, and reasonable attorneys' and experts' fees, and costs of suit as provided in 29 U.S.C. § 2617.

## IX. JURY DEMAND

125. Plaintiff hereby makes a demand for a trial by jury on all issues, claims, and defenses in this action.

## X. PRAYER

126. WHEREFORE, Plaintiff Brenden Stanislaus respectfully requests that the above-named Defendant be cited to appear in this matter and that, after jury trial by proof, he be awarded:

   A. Back pay, including but not limited to lost wages (including salary and commissions) and other employment benefits;

   B. Reinstatement to Plaintiff's position of employment, equivalent position of employment, or the position of employment Plaintiff would have enjoyed but for the discrimination, retaliation, and other illegal acts;

   C. In the event that reinstatement is not feasible, front pay with respect to all pay and benefits Plaintiff would have received;

D. Judgment against Defendant for compensatory damages including emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life;

E. Punitive damages;

F. Actual damages;

G. Judgment against Defendant for Plaintiff's reasonable attorneys' and experts' fees, and costs of suit;

H. Prejudgment and post-judgment interest as allowed by law; and

I. Such other and further legal and/or equitable relief to which Plaintiff may be justly entitled, as this Court may deem proper.

Respectfully submitted,

*/s/ Austin P. Campbell*

Robert J. Wiley
Texas Bar No. 24013750
*Board Certified – Labor and Employment Law – Texas Board of Legal Specialization*

Austin P. Campbell
Texas Bar No. 24103768
*Board Certified – Labor and Employment Law – Texas Board of Legal Specialization*

LAW OFFICE OF ROB WILEY, P.C.
2613 Thomas Avenue
Dallas, Texas 75204
Telephone: (214) 528-6500
Facsimile: (214) 528-6511
acampbell@robwiley.com

ATTORNEYS FOR PLAINTIFF